UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **CHRISTIAN KARLEVID,** ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> **JULIANA SLOTO,** ) <br> ) <br> Respondent. ) | Civil Action No. <br> 25-12000-BEM |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**MURPHY, J.**

This is a dispute between two loving parents who both want the best for their child. This Court's task is simply to determine the "most appropriate forum" for the adjudication of any custody disputes between them. *Monasky v. Taglieri*, 589 U.S. 68, 79 (2020). Following the framework set forth under federal and international law, the Court finds that forum to be Sweden. Accordingly, the Court will grant this petition and order the child's return.

**I.      Procedural Background**

Petitioner Christian Karlevid filed this case against Respondent Juliana Sloto under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 (the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*., on July 15, 2025. On July 29, 2025, the Court remotely held an initial hearing. The Hague Convention directs courts to "act expeditiously in proceedings for the return of children," ideally resolving the matter within six weeks. Hague Convention, Article 11. Accordingly, the Court scheduled an evidentiary hearing to begin on September 23, 2025.

In advance of the evidentiary hearing, the Court ordered Respondent to show cause for why the Court should not make certain findings based on the pleadings. Dkt. 16. As set forth more fully below, it is uncontested that Respondent removed the child from Sweden to Massachusetts on August 3, 2024, and has since kept the child in the United States. In her response to the Show Cause Order, Respondent explained her position that she has acted with Petitioner's "written consent for the Child to remain in the United States until at least December 31, 2024." Dkt. 25 at 5.

The Court held an evidentiary hearing from September 23–25, 2025. Respondent was represented by counsel. Petitioner acted pro se. Both parties testified and offered exhibits. Respondent also offered testimony from two teachers at the Massachusetts school where the child is currently enrolled, an expert psychologist, and a family member.

At the conclusion of the hearing, the Court found that the child had been wrongfully removed and retained in violation of Petitioner's custody rights in Sweden, the child's country of habitual residence as of each relevant date. The Court further found that return would not subject the child to a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation. Alternatively, the Court stated that, even if such a finding were appropriate, the Court would not exercise its discretion to deny removal on that basis.

As set forth below, the Court finds that Respondent's removal of the child from Sweden and her subsequent retention of the child in the United States were products of deceit and constituted abuse of the legal process.

## II. Findings

### A. Credibility

#### i. Respondent

The Court finds at the outset that it cannot credit Respondent's testimony. Respondent's demeanor, her evasive responses to questions posed by her attorneys and by this Court, and the obvious inconsistencies between Respondent's testimony and the evidence have led this Court to the unfortunate conclusion that Respondent willfully and repeatedly lied under oath. Most significantly, Respondent testified that, prior to her leaving Sweden on August 3, 2024, she and Petitioner agreed that Respondent would relocate to the United States with the child for one year. Elsewhere in her testimony, Respondent reverted to saying that their agreement was that she and the child would return by the end of December 2024. Either way, the Court finds this claim completely unbelievable. Both parties signed a "Letter of Consent," dated August 2, 2024, indicating that Respondent would travel to the United States with the child on August 3, 2024, and return on August 18, 2024, and including the specific flight on which Respondent and the child would return, for which return flight Respondent claims to have purchased tickets. *See* Ex. P-04. On the stand, Respondent could not provide a satisfactory explanation for why she would obtain, or why Petitioner would sign, a travel document stating that Respondent would return on August 18, 2024, if, as she claims, the parties had agreed that Respondent and the child would stay in the United States until August 2025.[1] Respondent likewise could not explain, if Petitioner

---

[1] The Court further notes that Respondent's testimony is difficult to square with the arguments she made prior to that testimony, suggesting that it might have been an unplanned improvisation. *See, e.g.*, Dkt. 25 at 7 (referring to the "parties' previously agreed upon date of return, December 31, 2024"). During closing arguments, Respondent's counsel attempted to explain that Respondent "didn't need" to rely upon the now-claimed year-long agreement (and so did not in her Show Cause Order response) because the argument as to December 31, 2024, was so sound. While an admirable effort at quick thinking, this explanation makes little sense. By Respondent's reading of the law (which admits of no possible retention so long as the parties ever had any agreement for the child to be present in the United States until a date certain), Petitioner would have had no claim until August 2025, and his July 15, 2025 complaint

3

already knew and agreed to this plan, why Respondent would send Petitioner an email on August 17, 2024, with the subject line: "[The child] taking temporary break from school in Sweden." That email is worth quoting at length:

> I just want to inform you that, after long consideration [the child] and I will stay just temporarily in the States. These last few days, we've been here i've seen how happy [the child] is around her family here. She has been playing with her cousins and spending so much time with the wider family here and she's extremely happy. She has developed so much when it comes to her English and she is so much more confident in speaking English and embracing her American culture. As a result of this, I would like her to continue to develop and explore more and connect with her family here and develop.
>
> As i mentioned, this is just [a] temporary move/stay. [The child is] enrolled in private school [. . .].
>
> I've spoken to the private school she'll be attending and we agreed that she will be seeing a school therapist/counselor as this might get a bit challenging for her as it'll be a change, so this is why it's really good that she meets with a counselor/therapist to talk about anything she wants to talk about with them. Of course, i will continue myself to talk to her as i always do. This is really in the best interest of [the child] and i know you want what's best for her as well.
>
> Now, I will make sure you continue to have direct communication with [the child]. [. . .] I'm happy to discuss this further to plan out your line of communication with [the child] as i believe you should have frequent contact with each other.
>
> I can understand how difficult this must be for you right now, i want you to take some time to think about it. [. . .]
>
> I've had contact with [the child's school in Sweden] and inform[ed] them that [the child] will be taking this semester off and for them to hold her spot until January [2025]. The principle is aware and send me the **attached** document that both you and i need to sign. Please have a read through the document and sign it. We will need to go through stockholm state [to] remove her pla[c]ement in [after-school activities]² otherwise they will still charge us.
>
> Let me know if you have any questions or if you want to have a video call with [the child] this weekend. [. . .]

---

would have been unripe. Surely, counsel would have preferred to argue that the Court lacked jurisdiction, rather than rest certainly on a fact-intensive assessment based on the child's four-month, contested stay in the United States.

² The original email uses the word "fridits," which appears to be a misspelling of "fritids," which means "recreational" in Swedish and can be used to refer to recreational activities. *See Fritids-*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/dictionary/swedish-english/fritids (last visited Sept. 26, 2025).

4

Ex. P-06 (emphasis in original).

      To be clear, although the timing and nature of Petitioner's knowledge of and consent to Respondent's plan to relocate herself, and the child, to the United States are at the forefront of this case, the Court did not find Respondent's lack of credibility limited to this central fact.  Rather, the Court has found inconsistencies big and small, consequential and inconsequential, throughout Respondent's testimony.  For one clear example, Respondent testified that she was handed the parties' joint custody agreement while still in the hospital after giving birth to the child and that she signed it without understanding its significance, not being fluent in Swedish.  However, this is belied by the fact that Respondent's signature on that joint custody agreement is dated April 16, 2022, 22 days after the child was born. Dkt. 1-12 at 3.[3]  The agreement itself thus corroborates Petitioner's testimony, offered in rebuttal, that he and Respondent signed the agreement in a Swedish tax office, rather than at the hospital.  From this, the Court can only conclude that Respondent lied about the circumstances surrounding when and where the parties signed the joint custody agreement to give the false impression that Respondent was manipulated into giving Petitioner joint custody.

      The Court likewise found non-credible Respondent's characterization of herself as the child's principal caregiver in Sweden.  Petitioner testified that the parties maintained an approximate 50/50 time split, with each parent taking custody in alternating weeks.  This is corroborated, at least, by a July 2021 police report, discussed further below, wherein Petitioner is noted as having told an officer the same. *See* Ex. P-12.  Supporting details lend further credibility to Petitioner's narrative.  For example, Petitioner described how he arranged his one-bedroom

---

[3] At the hearing, the parties agreed that the complaint and its attachments were admitted into evidence, if not automatically admitted by virtue of 22 U.S.C. § 9005.

apartment so that the child could have her own bedroom while staying with him. In stark contrast, Respondent repeatedly testified that the child "never lived" with Petitioner. However, when the Court attempted to clarify, Respondent refused to offer any estimate of how much time the child would spend with Petitioner during a given month, except to eventually admit that it was more than 5 nights per month (16%) but fewer than 15 nights per month (50%), but also that the child would sometimes stay with Petitioner for "weeks" at a time. Respondent simply refused to answer the Court's questions on the nature of the shared custody, responding evasively that nothing was written down or court-ordered, or else refusing to answer a simple question about where the child spent her time. The obvious nature of this prevarication, combined with the revealing refusal to be candid and truthful in response to other questions posed by the Court, compels the Court's discrediting Respondent's testimony. The Court is mindful that many parents often misremember and overstate their contributions to a child's upbringing. However, taken collectively, and in light of Respondent's demeanor throughout her testimony, the Court has concluded that Respondent's mischaracterizations go well beyond human nature, into the realm of deliberate falsehood.

These are only some of the examples of Respondent's testimony that the Court found unbelievable, and the fact that Respondent was willing and able to lie to the Court without reservation or hesitation means that the Court cannot credit her testimony at all. Respondent has shown a dangerous propensity to abuse the legal system in pursuit of her own advantage. Respondent's own text messages to Petitioner speak directly to this brazen propensity:

> Again, I'm happy to cooperate with you as long as you voluntarily give me full custody of her in Sweden and in USA. If you refuse to voluntarily give me the custody then I'll be seeing you in the court here in the USA. Let's me know once you get your US lawyer!

And likewise, from another text conversation:

> As I've written to you before, if I have full custody of [the child] in the USA and Sweden, I'm willing to work with you on agreement on how you can see her but if you don't want

to give me full custody then I'm not sure what to say to you. Once I have full legal custody of her in both countries, the[n] we can have agreement where you can see her.

[. . .]

[. . .] ***You need to move pass "right or lawful"!*** You're not going to win anything. Unless you have $200k dollars to take me to court in the US, you need to come to your senses and make the right decision for yourself and your daughter.

Ex. P-13 (emphasis added).

These conclusions leave the Court unable to credit Respondent's domestic violence allegations. The Court takes no joy in contributing to any narrative of doubt with respect to such charges, in this case or in general, but the rapidity and absurdity of Respondent's false statements to this Court put her testimony on any disputed fact beyond belief. It moreover must be pointed out that the only objective observer of any alleged domestic dispute, the Swedish police, found it appropriate to arrest Respondent, not Petitioner. *See* Ex. P-12.

### ii. Petitioner

By contrast, the Court found Petitioner generally credible. As between the two parties, the evidence frequently corroborated, or at least did not contradict, his version of the events. Petitioner readily admitted to unflattering facts, including telling Respondent that he "hated" her and that he "wouldn't shed a tear if she died."[4] Petitioner's description of a July 2019 incident resulting in a visit from the Swedish police is corroborated by the police report and by the fact that the incident resulted in Respondent's, rather than Petitioner's arrest. *See* Ex. P-12. The Court is mindful that official records of domestic disputes do not always tell the full story. However, it is striking that

---

[4] To be clear, the Court does not find that these were threats but rather heated statements made in light of Respondent's secreting away their child. Respondent herself testified that Petitioner "wasn't saying he was going to do it," only "if someone were to do it." Of course, threats can be obliquely put, but the Court simply does not find that to be what happened here.

the officer reported a threat by Respondent that she would "take [the child] and move to the US." *Id.*

B.  **Facts**

Based on the testimony and evidence presented at trial, the Court makes the following findings of fact:

### Parties

1. Petitioner is a Swedish citizen, currently residing in Sweden.
2. Respondent is a U.S.-Swedish dual citizen, currently residing in the United States.
3. Petitioner and Respondent met while attending university in the United States. Petitioner and Respondent became romantically involved and jointly relocated to Sweden in 2015.
4. On March 25, 2016, the child was born in Sweden to Petitioner and Respondent. *See* Ex. P-01.

### Prior to Removal

5. On April 22, 2016, Respondent confirmed Petitioner's paternity over the child, and the parties registered a joint custody agreement. *See* Dkt. 1-12.
6. Petitioner and Respondent lived together in Sweden with the child until November 2019.
7. From November 2019 to August 2022, Petitioner and Respondent shared joint legal and physical custody of the child, taking physical custody in roughly equal proportions. While the parties divided custody in equal proportions, the child would additionally reside with Petitioner during Respondent's allotted parenting time when she traveled for work.

### Circumstances Surrounding Removal and Retention

8. In June 2024, Respondent visited the United States with the child.
9. During that June 2024 trip or shortly thereafter, Respondent decided that she would permanently relocate herself and the child to the United States.

10. Initially, Respondent sought Petitioner's consent to relocate the child to the United States.

11. However, Petitioner consistently denied Respondent's request.

12. In response, Respondent formulated a plan to permanently relocate herself and the child to the United States, first, by obtaining Petitioner's consent under false pretenses and, second, by establishing custodial rights in the United States.

13. To first advance this plan, Respondent told Petitioner that she wanted to travel again with the child to the United States to visit her father, whom she claimed to be sick.

14. Relying on this representation, Petitioner purported to consent to the child's travel to the United States with Respondent for this purpose, from August 3, 2024, to August 18, 2024.

15. Respondent traveled with the child from Sweden to the United States on August 3, 2024.

16. During this time, unbeknownst to Petitioner, Respondent was secretly planning her new life with the child in the United States, including by arranging for long-term housing and the child's education.  *See* Ex. D-31–35.

17. On August 17, 2024, Respondent emailed Petitioner, for the first time informing him of any intention to stay in the United States past August 18, 2024.  Respondent still claimed, however, that her intention was only that this would be a "temporary" stay; that the trip's extension was based on the child's wishes, rather than on Respondent's premeditated design; and that Respondent and the child would return to Sweden at the end of the fall semester, by no later than December 31, 2024.  *See* P-06.

18. Relying on these representations and under financial and emotional duress, on or around August 18, 2024, Petitioner purported to acquiesce to the child's continued travel in the United States, until no later than December 31, 2024, including by submitting a signed "Notification of a longer stay abroad" to the Stockholm school system.  *See* Ex. D-17.

19. After speaking again with Respondent on the telephone, Petitioner discerned that he had been misled and that Respondent had no intention of returning with the child to Sweden.

20. On August 23, 2024, Petitioner sent a letter to the child's Swedish school, "formally withdraw[ing] [his] previous consent for the extended leave for [the child]." Ex. P-5.[5]

21. On or around August 23, 2024, Respondent became aware that Petitioner had withdrawn his consent for the child's travel.

22. To be clear, the Court finds that Respondent deliberately began planning to permanently remove the child from Sweden, in violation of Petitioner's wishes, in August 2024, while in Sweden. The Court finds that Respondent deliberately lied to trick Petitioner into agreeing to the initial steps of this plan.

### Petitioner's and Respondent's Legal Responses

23. On September 3, 2024, Petitioner filed an application under the Hague Convention with the Swedish Ministry for Foreign Affairs, formally requesting the assistance of Sweden and the United States to effect the child's return to Sweden. *See* P-07.

24. Sometime between August 23, 2024, and November 26, 2024, Respondent told Petitioner that she would "cooperate" with him if he "voluntarily g[ave] [Respondent] full custody of [the child] in Sweden and in [the] USA." Otherwise, Respondent stated that she would be "seeing [Petitioner] in the court here in the USA." *See* Ex. P-13.

25. On October 4, 2024, Petitioner filed a lawsuit in Stockholm District Court, seeking sole custody of the child. The Stockholm District Court granted Petitioner sole custody on an interim basis on December 6, 2024, and sole custody on February 13, 2025. *See* Ex. P-09.

---

[5] The letter itself is dated August 23, 2024. However, Petitioner captioned the exhibit "Revocation of consent (September 2024) and testified that he revoked his consent for the child's travel in September 2024. The Court relies on the documented date, though the difference is ultimately inconsequential.

26. In November 2024, criminal charges were brought against Respondent for unlawful detention of a child. However, the Solna District Court in Sweden did not find probable grounds and denied issuance of an arrest warrant, in part, based on the "Notification of a longer stay abroad," purporting to authorize the child's travel through December 31, 2024. Ex. D-17. *See* Ex. D-23.

27. In February 2025, criminal charges were again brought against Respondent. This time, the Solna District Court in Sweden issued an arrest warrant. *See* Ex. P-10.

28. Respondent has been advised by a Swedish defense attorney that there is a "big risk" that, if Respondent were to return to Sweden, she would be held in custody until trial. *See* Ex. D-30. Respondent has not put forth any evidence that she has engaged in any meaningful conversation with her defense attorney about what would be necessary to address or resolve the criminal allegation.

### Child's Habitual Residence

29. Petitioner and Respondent never formed a shared intention for the child to abandon Sweden as her place of habitual residence or for the child to take up the United States as her place of habitual residence.

30. To the extent Petitioner and Respondent shared any intention for the child to travel temporarily to the United States, that intention was predicated on Respondent's false representations.

31. As of December 31, 2024, the child was eight years old.

32. As of December 31, 2024, the child was enrolled in a "prestigious" Swedish school where she participated in multiple, scheduled extracurricular activities. *See* Ex. D-17.

33. As of December 31, 2024, the child was also enrolled in a high-quality school in the United States where she participated in multiple, scheduled extracurricular activities.

11

34. The child's native and primary language is Swedish.

35. Despite making admirable progress, as of December 31, 2024, the child had not attained grade-level proficiency in English.  *See* Ex. D-08.

36. The child has meaningful family connections in Sweden, including with Petitioner.

37. The child has meaningful family connections in the United States, including with Respondent.

38. As of December 31, 2024, the child had spent just over four months (131 days) in the United States.

### Risk of Harm

39. Respondent has not made credible allegations of domestic violence against Petitioner.

40. Respondent has not presented any evidence as to what the time to trial might be for her pending criminal charges, the viability of those criminal charges, or what the penalty for those charges might be.

41. Respondent has made no attempt to petition the Swedish courts for custodial rights since relocating to the United States.

III. **Conclusions**

Based on the findings, the Court makes the following conclusions of law:

### Petitioner's Prima Facie Claim for Return

1. Considering the totality of the circumstances, *Monasky*, 589 U.S. at 71, the child's place of habitual residence was Sweden on December 31, 2024, and on all dates prior.  Given the age of the child, the Court attaches some significance to the lack of a shared intention by Petitioner and Respondent that the child would permanently relocate to the United States.  The Court has also attached some significance to the fact that the child spent the first eight years of her life in Sweden and had an established daily life in Sweden, including

12

extracurricular activities, friends, and family. The Court has likewise weighed and considered the evidence presented by Respondent that, by December 2024, the child was acclimated to the United States. The Court does not find that this evidence establishes that the child was fully acclimated to the United States by December 31, 2024, nor does the Court find that such partial acclimation outweighs the evidence that the child's true home was, as of December 31, 2024, in Sweden.

2. On December 31, 2024, and on all dates prior, Petitioner had been exercising his custodial rights within the meaning of the Hague Convention.

3. On August 3, 2024, Respondent wrongfully removed the child from Sweden to the United States. Respondent violated Petitioner's parental rights under Swedish law to make an informed, knowing decision about his child's travel and residence.

4. On August 17, 2024, and thereafter, Respondent wrongfully retained the child in the United States. Respondent violated Petitioner's parental rights under Swedish law to make an informed, knowing decision about his child's travel and residence.

5. On or about August 23, 2024, and thereafter, Respondent wrongfully retained the child in the United States, notwithstanding Petitioner's unequivocally communicating his desire that the child return to Sweden. Respondent violated Petitioner's parental rights under Swedish law to make decisions about his child's travel and residence.

6. On December 31, 2024, and thereafter, Respondent wrongfully retained the child in the United States, notwithstanding the expiration of the parties' purported agreement that the child could travel in the United States until that date. Respondent violated Petitioner's parental rights under Swedish law to make decisions about his child's travel and residence.

**Consent**

7. To be effective, consent must be informed and knowing. Because of Respondent's deceitful behavior, Petitioner's purported acts of consent or acquiescence were not informed or knowing. Accordingly, Petitioner did not consent or acquiesce, as those words are used in the law, to Respondent's above-listed acts of removal and retention.

8. Even if the Court were to find that Petitioner consented or acquiesced to the removal or retention, the Court would not find it appropriate to exercise its discretion under the Hague Convention to deny return.

**Grave Risk of Harm**

9. Respondent has not established, by clear and convincing evidence, that the child would be deprived of Respondent's presence for an extended length of time if the child were returned to Sweden. The Court finds no reliable evidence that detention resulting from pending criminal charges would result in the child's being deprived of Respondent's presence for any prolonged period of time or that, if the child were returned to Sweden, Swedish law would prohibit contact between Respondent and the child.

10. Even if the Court were to find that the child's return to Sweden posed a risk of the child's being deprived of Respondent's presence for an extended period of time, the Court would not exercise its discretion under the Hague Convention to deny return. The Court concludes that, in this case, such an exercise of discretion would undermine the purpose of the Hague Convention.

11. Respondent has not presented a credible risk of domestic violence.

**IV.     Discussion**

"[I]t is not easy . . . to attach an abstract label to a complex of discrete facts." *Darin v. Olivero-Huffman*, 746 F.3d 1, 10 (1st Cir. 2014) (quoting *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010)).  Recognizing that there was a dispute as to the relevant date for the habitual residence analysis, the Court made its finding based on the later date put forth by Respondent, December 31, 2024.  However, in the interest of record clarity, the Court finds it appropriate to explain why it does not believe that to be the correct reference point.

Respondent has argued that the earliest possible date to consider habitual residence is December 31, 2024, based on the parties' purported agreement that Respondent and the child could travel to the United States until that date.  *See generally* Dkt. 25.  This is certainly incorrect, considering the Court's findings as to removal.  Removal, no doubt, occurred on August 3, 2024.  That removal was wrongful because, having joint custody, Petitioner's consent was required for any decision with far-reaching consequences for the child's future, such as permanently relocating the child to another country and applying for her enrollment in an American school.[6]  Using this date, the Court has found that no consent or acquiescence affirmative defense applies, as the purported acts of consent or acquiescence put forward by Respondent were void for having been obtained by fraud.  *See Nicolson*, 605 F.3d at 107 (affirming district court's finding of no defense based on consent where the facts showed that the petitioner "did not consent to more than a temporary stay").  However, even if this consent were deemed valid, a view this Court expressly disclaims, the Court would decline to use its discretion under the Hague Convention to deny return on that basis.

---

[6] Föräldrabalken, SFS 1949:381, 6 kap. 11, 13 §§ (Swed.).  The (United States) Supreme Court has confirmed that such rights are within the custody rights protected under the Hague Convention.  *See Abbott v. Abbott*, 560 U.S. 1, 10 (2010).

The Court recognizes that Petitioner's claim was initially framed in the complaint as one for retention, rather than removal. *See* Dkt. 25 at 4. However, it is well-established that "[i]t is the facts well pleaded, not the theory of recovery or legal conclusions, that state a cause of action and put a party on notice" of a claim. *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999) (internal quotation omitted), *cert. denied*, 531 U.S. 873 (2000). Here, Petitioner clearly alleged that Respondent "traveled to the United States with [the child] under the pretext of a temporary vacation." Dkt. 1-1 ¶ 4. This allegation of a deceitful removal put Respondent on notice. Moreover, these facts were well covered at the evidentiary hearing, without objection, and the Court would therefore find that Respondent implicitly consented to their litigation. *See Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 319 (1st Cir. 2012) (citing Fed. R. Civ. P. 15(b)).

Nevertheless, if Petitioner's claim were framed as one for retention, the Court would conclude that the correct date for the habitual residence analysis would be August 17, 2024, "when [Respondent] informed [Petitioner] that she would be remaining in [the United States]." *See Darin*, 746 F.3d at 10.[7]

The Court also recognizes that some courts would treat August 23, 2024, the date Petitioner formally revoked his consent for the child's travel to the United States, as the relevant date of retention because it was "the date beyond which the noncustodial parent no longer consent[ed] to the child's continued habitation with the custodial parent and instead s[ought] to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *See Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019) (quoting *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017), and citing *Marks on behalf of SM v. Hochhauser*,

---

[7] Again, Petitioner's purported acts of consent or acquiescence would then be viewed through that affirmative defense framework.

876 F.3d 416, 417, 420–23 (2d Cir. 2017), and *Darin*, 746 F.3d at 10–11) ("In each of these cases, although the petitioning and non-custodial parent initially assented to the child's removal from the country of habitual residence, the date consent was revoked constituted the date of wrongful retention.").

Respondent relies principally on *Toren v. Toren*, 191 F.3d 23 (1st Cir. 1999), to argue that the Court was required to use December 31, 2024, for its habitual residence analysis. *See* Dkt. 25 at 7. To repeat again, for the avoidance of doubt, the Court *did* use December 31, 2024, for its habitual residence analysis. Still, the Court concludes that Respondent over-reads *Toren* by far. In *Toren*, the First Circuit held that a district court lacked jurisdiction to hear a father's retention claim based on purported indicia that the mother would, in the future, retain his children in the United States past their agreed upon (and court-adopted) date. *Toren*, 191 F.3d at 26–28. The First Circuit concluded that the petitioner had alleged an "anticipatory violation," not cognizable under the Hague Convention. *Id.* at 28.

*Toren* is inapposite because the agreement between the parties in that case was still uncontestably in effect. That unchallenged agreement (a court-approved separation agreement) authorized the mother's presence with the children in the United States until the future date provided. *Id.* at 25. Thus, the father had no choice but to plead a violation that could not yet have possibly occurred, consistent with the terms of that operative and authorizing agreement. *See id.* at 27 & n.4 (quoting the complaint's allegation of "the mother's '*intention* to wrongfully retain the children in the USA'" and that the mother was "'*thinking about*'" not returning the children (emphases in *Toren*)). By contrast, here, the purported agreement *has* been challenged, both as initially void and as subsequently revoked. Thus, a claim of retention lies.

Respondent's reading of *Toren* would make any such purported agreement impregnable to scrutiny and incapable of revocation. Such a reading cannot be squared, at least, with Swedish law, the source of Petitioner's custodial rights. *See* Ex. P-08 (recognizing Petitioner's revocation of consent and awarding Petitioner sole custody on an interim basis); Ex. P-09 (granting Petitioner sole custody in final judgment) ("It must be considered unlikely that [Respondent] would not be aware that [Petitioner] had withdrawn his consent to stay in the United States."). Nor can it be squared with other decisions from the First Circuit. *See, e.g.*, *Darin*, 746 F.3d at 10 (finding, notwithstanding prior agreement, that retention started when parents were no longer aligned as to their long-term intentions).

## V. Conclusion

Based on the findings of fact, conclusions of law, and reasons stated herein, the Court has granted Petitioner's request and ordered that the child be returned to Sweden. *See* Dkt. 38 (Order of Judgment).

**So Ordered.**

|  |  |
|---|---|
|  | /s/ Brian E. Murphy |
|  | Brian E. Murphy |
| Dated: September 26, 2025 | Judge, United States District Court |